☐ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No. 24-880M(NJ) |
| Apple iPhone 11, Serial Number FFWLNA11N7ZJ, | ) |
| located within FBI Evidence at 3600 South Lake | ) |
| Drive, St. Francis, Wisconsin, 53225 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 7/10/2024 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.      xx☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Nancy Joseph _____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: 6/26/2024 @ 4:36 p.m. _____

_____ *Judge's signature*

City and state:      Milwaukee, WI _____      Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("Provider") and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Provider. The attached records consist of _____ (*generally describe records in terms of pages, CDs or megabytes of data*). I further state that:

a.　　all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Provider, and they were made by Provider as a regular practice; and

b.　　such records were generated by Provider's electronic process or system that produces an accurate result, to wit:

1.　　the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Provider in a manner to ensure that they are true duplicates of the original records; and

2.　　the process or system is regularly verified by Provider, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____　　_____
Date　　　　　　　　　　　　　　　　　Signature

## <u>ATTACHMENT A</u>

The property to be searched is described as follows:

        a.     One black Apple iPhone 11, Serial Number FFWLNA11N7ZJ (hereinafter "**TARGET DEVICE**");

       67.    **TARGET DEVICE** is currently located within FBI Evidence, located at 3600 South Lake Drive, St. Francis, Wisconsin, 53225.

       This warrant authorizes the forensic examination of the **TARGET DEVICE** for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the **TARGET DEVICE** described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846, and involve Arthur WARD, including, but not limited to:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording schedule or travel;

   e. all bank records, checks, credit card bills, account information, and other financial records;

   f. Photographs and/or video depicting possession of drugs;

   g. Any evidence related to either the ownership, purchase, or possession of drugs;

   h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

   i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **TARGET DEVICE**;

2.      Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone 11, Serial Number FFWLNA11N7ZJ,<br>located within FBI Evidence at 3600 South Lake Drive,<br>St. Francis, Wisconsin, 53225 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 24-880M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Eastern _____ District of _____ Disctrict _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1)<br>18 U.S.C. § 924(a)(8) | Possession of a firearm or ammunition by a person convicted of a felony |
| 21 U.S.C. § 841; 846 | Possession with the intent to distribute illegal narcotics |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jacob Cowan, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 6/26/2024

*Judge's signature*

City and state: Milwaukee, WI

Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT**

I, Jacob Cowan, being duly sworn, state the following information to be true to the best of my knowledge, information and belief:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a sworn federal law enforcement officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses pursuant to Titles 18, and 21 of the United States Code. I have been employed as a Special Agent with the FBI since June 2016. Prior to this, I served as an Officer in the United States Army for twelve years. I have obtained a Bachelor of Science Degree in Criminal Justice from the University of Wisconsin-Milwaukee, a Master's in Professional Studies (M.P.S.) from St. John's University, and a Post Graduate Certificate from the Kennedy School of Government at Harvard University. I graduated from the FBI Academy in Quantico, Virginia in 2016 and have over eight years of law enforcement experience. I have been involved in the enforcement and investigation of numerous violations of federal law to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law. I have used investigative techniques including, but not limited to: consensual monitoring, physical

surveillance, witness and subject interviews, court authorized electronic surveillance, review and analysis of telephone records, and the execution of search and arrest warrants.

3.     In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of cellular devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their locations.

4.     As such, I am "an investigator or officer charged by the Attorney General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States," within the meaning of Section 3051(a) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, execute warrants and to make arrests for offenses against the United States and offenses enumerated in United States Code Title 18 and Title 21.

5.     Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

6.     To this end, based upon my training and experience, I know that individuals involved in drug trafficking commonly use cellular telephones to facilitate their drug trafficking

activities. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.  I know that drug traffickers commonly maintain and possess multiple cellular telephones, swap out cellular telephones routinely (i.e., discontinue use of one or more cellular telephones and replace them with new phones in hopes of evading detection by law enforcement), and sometimes allow other drug trafficking associates to use their phones to conduct drug trafficking business. I also know that it is common for crime suspects who illegally possess controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the controlled substances and firearms that they control, possess, buy, and sell.

7.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.     The property to be searched is described as follows:

a.     One black Apple iPhone 11, Serial Number FFWLNA11N7ZJ, (hereinafter "**TARGET DEVICE**");

9.     **TARGET DEVICE**, is currently located within FBI Evidence, located at 3600 South Lake Drive, St. Francis, WI 53235.

10.     The applied-for warrant would authorize the forensic examination of the **TARGET DEVICE** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11.     I am investigating Arthur WARD ("WARD") who is suspected of a Firearm violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8); and for possessing with the intent to distribute illegal narcotics, in violation of Title 21, United States Code, Sections 841 and 846.

12.     The Federal Bureau of Investigation ("FBI") is investigating allegations that members of the Gangster Disciples street gang, including Arthur WARD, are conspiring with each other, and other individuals yet unknown, to traffic firearms and transport and distribute controlled substances, namely cocaine, in Milwaukee, Wisconsin.

13.     During this investigation, a confidential source (CS-2), operating at the direction and control of case agents, purchased three firearms from WARD and approximately two ounces of cocaine. The purchases occurred in May and June 2024, at WARD's Milwaukee area residence.

14.     CS-2 began providing information to law enforcement in September 2023. CS-2 is cooperating in exchange for consideration on pending federal drug and firearm related offenses. The information provided by CS-2 to law enforcement agents is substantially against CS-2's penal interest. Additionally, to the extent possible, information provided by CS-2 has been corroborated by agents through external sources, including physical evidence, consensually recorded telephone calls, phone toll information, audio recordings, surveillance, controlled buys, and law enforcement databases. CS-2 has a criminal history that includes possession of a controlled substance, manufacturing and delivery of a controlled substance, armed robbery, escape, battery, domestic violence, and various motor vehicle violations and misdemeanor convictions. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS-2 is credible and CS-2's information is reliable.

*May 28, 2024, Controlled Firearm Purchase with CS-2 from WARD*

15.     On May 28, 2024, CS-2 notified law enforcement he/she was in contact with WARD about the purchase of firearms. CS-2 advised law enforcement that WARD would not text with CS-2 because WARD was being very careful due to WARD knowing he had an active warrant for his arrest. Therefore, conversations setting up the purchase of 5 firearms from WARD by CS-2 were unrecorded calls. Law enforcement instructed CS-2 to continue to communicate with WARD in the attempt to locate him and to purchase firearms.

16.     On May 28, 2024, at approximately 5:02 p.m., CS-2 contacted law enforcement and stated WARD wanted to sell CS-2 two Taurus G2 9mm firearms, one of which had an extended magazine. Law enforcement advised CS-2 to confirm with WARD that CS-2 would purchase both of the firearms.

17.     On May 31, 2024, at approximately 2:30 p.m., law enforcement met with CS-2 at a pre-determined staging area. CS-2 was searched for contraband and United States Currency (U.S.C.) with negative results. Law enforcement searched CS-2's vehicle for contraband and U.S.C. with negative results.

18.     CS-2 advised law enforcement that he/she would call WARD on the way to north Milwaukee, where CS-2 believed WARD to be staying, to receive the exact address of where CS-2 would be meeting WARD to purchase firearms.

19.     At approximately 2:34 p.m., at a staging area, CS-2 was given $1,400 U.S.C.1 in pre-recorded buy funds. CS-2 was equipped with audio and visual recording equipment and the devices were activated.

20.     Thereafter, CS-2 departed the staging area for north Milwaukee. CS-2 was followed by a law enforcement surveillance team. CS-2 drove to north Milwaukee.

21.     At approximately 2:48 p.m., CS-2 placed a consensually recorded telephone call to the **TARGET DEVICE**. CS-2 said, "What's the word my boy?" WARD said, "What's the word my boy?" CS-2 said, "Shit, where you at with it?" WARD said, "Shit, I'm going to be back at the house in like fifteen minutes." CS-2 said, "Like fifteen...you still at the same spot-on Appleton?" WARD said, "On Appleton?" CS-2 said, "Nigga the last time I moved your spot it was by a graveyard, right?" WARD said, "Uh yeah, yeah, yeah, yup, I ain't over there no more bro." CS-2 said, "Oh." WARD said, "I'm on Clarke and shit." CS-2 said, "You want me to come where?" There was a malfunction with the recording equipment, and during the malfunction, WARD told CS-2 to go to the 2601 North Holton Street, Milwaukee, Wisconsin, which was WARD's residence.

22.     At 3:24 p.m., CS-2 arrived at 2601 North Holton Street, Milwaukee, Wisconsin, and parked in front of the residence.

23.     At approximately 3:28 p.m., CS-2 placed a consensually recorded call to the **TARGET DEVICE** and said, "I'm all the way down..." WARD said, "Come to the side here." CS-2 said, "Alright bet." CS-2 drove down the street. WARD was still on the telephone with CS-2. CS-2 said, "You still there my boy?" WARD said, "Huh?" CS-2 said, "Mother fucking traffic busy as hell right here." WARD said, "Hell yeah (Unintelligible) [WARD spoke to an unidentified individual in the background], my nigga said he was lying, I didn't know you was out there in the front bro." CS-2 said, "Hell yeah, I'm like damn, I had called you 7 though but your girl answered. I was like why does he have me going a fucking busy street." CS-2 said, "I see you." CS-2 parked CS-2's vehicle and exited.

24.     At approximately 3:29 p.m., CS-2 met WARD at WARD's North Holton Street residence. CS-2 said, "What's the word my boy, fuck with you?" WARD said, "(Unintelligible)."

WARD was wearing red shorts and a red T-shirt. WARD was standing at the passenger seat of a white in color vehicle parked on Holton Street and retrieved a pistol with an extended magazine. WARD put the pistol under his shirt in his shorts and walked to the side door of WARD's North Holton Street residence. See Figure 1.



*Figure 1*
*(May 31, 2024, Depicting Arthur WARD enter 2601 North Holton Street, Milwaukee,*
*Wisconsin with firearm with extended magazine and an unidentified woman)*

25.     Case agents conducting surveillance at WARD's North Holton Street residence confirmed that the individual CS-2 met with was Arthur WARD by comparing the individual they observed with a booking photograph of Arthur E. WARD (DOB xx/xx/1988).

26.     Thereafter, the CS-2 followed WARD, and they entered WARD's North Holton Street residence. Once inside WARD's residence, WARD and CS-2 were in the kitchen. There

were multiple unidentified females and children present. WARD handed CS-2 the firearm. CS-2 removed the magazine from the firearm and WARD took the firearm back. WARD pulled the slide of the firearm to the rear to show CS-2 there was no ammunition in the chamber. WARD then gave the firearm back to CS-2. CS-2 and WARD talked about choppers [Assault weapons] and the cost of choppers. Then, WARD said to CS-2, "(Unintelligible), I want you to come outside so you can see it bro." WARD and CS2 continued to talk about choppers. WARD said, "Mother fuckers ain't be having no choppers." WARD said, "(Unintelligible) mother fucker be 1250 for an AR." CS-2 said, "What the hell they in the store for, 800?" CS-2 and WARD continued to talk about the prices of AR's. WARD handed what appeared to be cocaine in a clear plastic bag to CS-2 to look at. CS-2 handed the suspected cocaine back to WARD and WARD placed the suspected cocaine in his pocket.

27. During the time CS-2 was inside WARD's residence, WARD was looking for his cellular telephone. Additionally, an unidentified female entered WARD's North Holton Street residence, and WARD conducted a narcotics transaction with of what 9 appeared to be pills with this unidentified female. Also, during the time that CS-2 was inside WARD's residence, WARD placed a telephone call to an unknown individual and said, "When you pull up, I'm going to come outside." Later on, WARD received a telephone call from an unidentified individual and said, "Your boy outside right now, okay, I'm coming outside right now." WARD and CS-2 walked outside.

28. Based on their training, experience, and familiarity with this investigation, case agents believe WARD had one firearm on his person that he sold to CS-2 and was awaiting the arrival of a second firearm to sell to CS-2. Case agents further believe WARD was talking to CS-2 about the potential sale of assault weapons in the future. Case agents believe WARD showed

CS-2 cocaine to entice CS-2 into purchasing cocaine from him.

29. When WARD and CS-2 went outside, they met an unidentified white female who was standing outside, who said, "I don't know if this is him in the silver car, (Unintelligible) meet in the alley." The unidentified female then said, "There he is." WARD walked over to a dark in color SUV, and the unidentified white female and WARD stayed by WARD's North Holton Street residence. WARD stayed over by the dark in color SUV for a few minutes. WARD walked back from the dark in color SUV, and WARD and CS-2 subsequently walked back inside WARD's residence. WARD handed another firearm to CS-2. In the consensual audio video recording, CS-2 was overheard pulling the slide of a firearm to rear multiple times. CS-2 and WARD agreed to talk at a later date, and CS-2 exited WARD's residence and entered CS-2's covert vehicle.

30. Based on their training, experience, and familiarity with this investigation, case agents believe the unidentified white female called WARD and informed WARD that an unidentified individual arrived at WARD's North Holton Street residence with the second firearm WARD was to sell CS-2. Case agents further believe WARD and CS-2 walked outside WARD's residence where WARD met with an unidentified individual and received a firearm. Case agents believe WARD and CS-2 then walked back into WARD's North Holton Street residence where WARD sold the second firearm to CS-2.

31. At approximately 3:53 p.m., law enforcement followed CS-2 back to the staging area.

32. At approximately 4:10 p.m., CS-2 arrived at the staging area, turned over two firearms to law enforcement: a Taurus Armas G2C 9mm pistol, bearing serial number ABC342083, and a Taurus Armas G2C 9mm pistol with and extended magazine, bearing serial number ACG990064. Both firearms were manufactured outside of the state of Wisconsin. The

audio and visual recording equipment was deactivated. Law enforcement searched CS-2 for U.S.C. and contraband with negative results. Law enforcement searched CS-2's vehicle for U.S.C. and contraband with negative results.

### *June 1, 2024, Controlled Firearm Purchase with CS-2 from WARD, and Execution of Search Warrant at 2601 North Holton Street, Milwaukee, Wisconsin*

33.     On June 1, 2024, law enforcement officers asked CS-2 to inquire with WARD over the **TARGET DEVICE** about the purchase of firearm switches. CS-2 spoke to WARD in an unrecorded telephone call about the purchase of switches and WARD sent a photograph via text message of an AK-47 that WARD was selling.



*Figure 2*

34.     On June 4, 2024, CS-2 contacted law enforcement and stated CS-2 had an unrecorded conversation with WARD over the **TARGET DEVICE** about the future purchase of additional firearms. CS-2 stated WARD had an AK-47, a Dreco, and a revolver to sell. Law enforcement inquired about WARD being able to sell a switch for a firearm, and WARD was not able to produce one. WARD and CS-2 had an additional unrecorded conversation about WARD selling CS-2 cocaine. CS-2 told law enforcement WARD had multiple ounces of cocaine for sale. CS-2 said WARD was asking $1,350 for the AK-47 and $950 per ounce of cocaine. Law

enforcement instructed CS-2 to set up the purchase of the AK-47 and cocaine.

35.     On June 10, 2024, the Honorable William E. Duffin, United States Magistrate Judge, authorized a search warrant for WARD's residence located at 2601 North Holton Street, Milwaukee, Wisconsin. See 24 MJ 118.

36.     On June 10, 2024, CS-2 notified law enforcement he/she was in contact with WARD over the **TARGET DEVICE** about the purchase of an AK-47 and two ounces of cocaine, which was set for 12 June 11, 2024. Although the calls were unrecorded, CS-2 sent law enforcement screen shots of the call logs of when CS-2 spoke to WARD over the **TARGET DEVICE**.

37.     On June 11, 2024, at approximately 1:45 p.m., law enforcement met with CS-2 at a pre-determined staging area. CS-2 was searched for contraband and U.S.C. with negative results. Law enforcement searched CS-2's vehicle for contraband and U.S.C. with negative results.

38.     At approximately 1:47 p.m., at a staging area, CS-2 was given $3,250 U.S.C. in pre-recorded buy funds. CS-2 was equipped with audio and visual recording equipment and the devices were activated.

39.     Thereafter, CS-2 departed the staging area for WARD's residence, 2601 North Holton Street, Milwaukee, Wisconsin. CS-2 was followed by a law enforcement surveillance team. CS-2 drove to north Milwaukee.

40.     Once CS-2 arrived at 2601 North Holton Street, Milwaukee, Wisconsin, CS-2 parked CS-2's vehicle. CS-2 met with WARD at the residence. CS-2 entered the residence with WARD and provided WARD $3,250 in buy money for an AK-47 and approximately two ounces of suspected crack cocaine. WARD was on the telephone with an unidentified individual. WARD ended the telephone call with the unidentified individual and told CS-2 he needed to drive to 5th

and Ring, Milwaukee, Wisconsin. CS2 told WARD that CS-2 would follow WARD to 5th and Ring, Milwaukee, Wisconsin. WARD and CS-2 exited 2601 North Holton Street, Milwaukee, Wisconsin. CS-2 entered CS-2's vehicle and WARD entered a grey in color sedan. CS-2 followed WARD to 5th and 13 Ring, Milwaukee, Wisconsin. Law enforcement was conducting physical surveillance and followed CS-2 and WARD to 5th and Ring, Milwaukee, Wisconsin.

41.     CS-2 parked CS's vehicle at the intersection of 5th and Ring, Milwaukee, Wisconsin, and WARD parked around the corner. Law enforcement conducting physical surveillance observed WARD meet with an unidentified individual in a blue in color Mazda truck. WARD departed the area and was followed by law enforcement back to WARD's North Holton Street residence. CS-2 called WARD on the **TARGET DEVICE** and asked WARD where WARD was located. WARD advised CS-2 he went back to WARD's North Holton Street residence. CS-2 departed the intersection of 5th and Ring, Milwaukee, Wisconsin and drove back to WARD's North Holton Street residence. Law enforcement followed CS-2 back to WARD's residence.

42.     Once CS-2 arrived at WARD's North Holton Street residence, CS-2 exited CS-2's vehicle and met WARD on the sidewalk in front of the residence. CS-2 followed WARD into the residence. Once inside the residence, a firearm was captured on CS-2's audio visual recording device on the floor in the kitchen of the residence. WARD handed CS-2 approximately two ounces of suspected crack cocaine. CS-2 and WARD exited the residence and CS-2 entered CS-2's vehicle and departed the area.

43.     After CS-2 departed, a federal search warrant was executed at 2601 North Holton Street, Milwaukee, Wisconsin. WARD was located inside the residence and placed into custody. Located on his person was approximately $1,370, some of which was pre-recorded law enforcement funds provided to the CS-2 to purchase the cocaine 14 and firearm and the **TARGET**

**DEVICE**. A firearm was found in the basement of the residence. This firearm resembled the firearm that WARD had on his person during the controlled firearm and narcotics purchase with CS-2, as depicted below in Figures 3 and 4.



| | |
|---|---|
| *Figure 3*. WARD with firearm in waistband during narcotics and firearms transactions with CS-2. | *Figure 4*. Firearm recovered from basement of WARD's residence. |

44.     At approximately 3:00 p.m., law enforcement followed CS-2 back to the staging area.

45.     At approximately 3:27 p.m., CS-2 arrived at the staging area, turned over the purchased firearm, a Century Arms C39V2 7.62 mm firearm, bearing serial number

C39V2A38689, which was manufactured outside of the state of Wisconsin; and approximately two ounces of suspected crack cocaine to law enforcement, which was field tested using a TruNarc Handheld Narcotics Analyzer, and tested positive for cocaine base. The recovered Century Arms firearm resembled the firearm in the photograph that WARD sent CS-2 before the purchase occurred. The audio and visual recording equipment was deactivated. Law enforcement searched CS-2 for U.S.C. and contraband with negative results. Law enforcement searched CS-2's vehicle for U.S.C. and contraband with negative results.

46.     WARD was transported by the U.S. Marshals to FBI Chicago for an interview. WARD was provided his advice of rights by law enforcement and signed the advice of rights form. WARD stated he was the middleman between CS-2 and an individual he identified as "Payne." According to WARD, Payne had a lot of firearms. WARD continued to tell law enforcement officers that he was the middleman and could get things for people.

47.     WARD has a criminal history that includes a felony conviction for possession with intent to distribute cocaine (2007). WARD has an active warrant for his 16 arrests for possession of a firearm-convicted of a felony, and for possession with intent to distribute cocaine.

48.     The **TARGET DEVICE** is currently in the lawful possession of FBI. The **TARGET DEVICE** came into FBI's possession after WARD was arrested pursuant to an arrest warrant issued in the Eastern District of Wisconsin by the Honorable William E. Duffin, U.S. Magistrate Judge.

49.     The **TARGET DEVICE** is currently in storage at FBI, located at 3600 South Lake Drive, St. Francis, Wisconsin 53235. In my training and experience, I know that the **TARGET DEVICE** has been stored in a manner in which its contents are, to the extent material

to this investigation, in substantially the same state as they were when the **TARGET DEVICE** first came into the possession of the FBI.

50.     As a result of my training and experience, I know that drug dealers and criminals use cellular phones to conduct their business and plan crimes. I am also aware that cellular telephones provide narcotics traffickers and criminals with mobile access and control over their illegal trade. They often use cellular telephones to communicate with one another in furtherance of their activities. I am also aware that drug dealers and criminals use multiple cellular telephones to try and thwart law enforcement from uncovering their illegal activity. I am also aware that individuals engaged in illegal activities take pictures using their cellular phones of themselves with narcotics and firearms. I know cell phones frequently retain information for long periods of time, including retaining call histories, text messages, voicemail messages, photographs, internet history, GPS location, and other information that can be retrieved from the cell phone even long after the cell phone ceased to be used. If unused and unaltered, like the **TARGET DEVICE** in this case, data can remain indefinitely. Cellular telephones are best analyzed in an offsite environment where the appropriate equipment can be used to download the data off the phone and preserve a copy of the downloaded material for inspection.

51.     Based on my training and experience, I believe that the evidence recovered/observed during WARD's arrest, including a firearm, narcotics packaging, banking receipts, and the narcotics previously purchased from WARD over the course of the investigation, WARD is involved in drug trafficking. I also believe WARD maintained ownership and/or control over the **TARGET DEVICE** that was recovered because of his arrest.

52.     Additionally, based upon the facts described above, I believe that WARD used the **TARGET DEVICE** to facilitate controlled substances transactions and may provide evidence of

drug trafficking, which may likely be stored and recorded on the **TARGET DEVICE**. More particularly, I believe that there is probable cause to believe that a search of the information contained within the **TARGET DEVICE** described above will produce evidence of a crime, namely evidence related to the possession and trafficking of controlled substances.

## **TECHNICAL TERMS**

53.     Based on my training and experience, I use the following technical terms to convey the following meanings:

54.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

55.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.

Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

56.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

57.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

58.     PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

59.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

60.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

61.     Based on my training, experience, and research, I know that the **TARGET DEVICE**, has capabilities that allow it to serve as a wireless telephone, digital camera, portable

media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

62.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

63.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICE** because:

        a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

        c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.	The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.	Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.	Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

64.	*Nature of the examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARET DEVICE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARET DEVICE** to human inspection in order to determine whether it is evidence described by the warrant.

65.	*Manner of execution*. Because this warrant seeks only permission to examine the devices already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

66.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICE** described in Attachment A to seek the items described in Attachment B.

## <u>ATTACHMENT A</u>

The property to be searched is described as follows:

        a.      One black Apple iPhone 11, Serial Number FFWLNA11N7ZJ (hereinafter

"**TARGET DEVICE**");

      67.     **TARGET DEVICE** is currently located within FBI Evidence, located at 3600

South Lake Drive, St. Francis, Wisconsin, 53225.

      This warrant authorizes the forensic examination of the **TARGET DEVICE** for

the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the **TARGET DEVICE** described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846, and involve Arthur WARD, including, but not limited to:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording schedule or travel;

   e. all bank records, checks, credit card bills, account information, and other financial records;

   f. Photographs and/or video depicting possession of drugs;

   g. Any evidence related to either the ownership, purchase, or possession of drugs;

   h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

   i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **TARGET DEVICE**;

2.      Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.